Louis S. Franecke, Esq. (Cal. State Bar No. 52386)
FRANECKE LAW GROUP
1115 Irwin Street, Suite 100
San Rafael, CA 94901
Telephone: 415-457-7040
Facsimile:  415-457-7041

Reza Torkzadeh, Esq. (Cal. State Bar No. 249550)
THE TORKZADEH LAW FIRM
11601 Wilshire Boulevard, Suite 500
Los Angeles, CA 90025
Telephone: 310-935-1111
Facsimile:  310-295-1986

Attorneys for Plaintiff JOHN BAUER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN BAUER,<br><br>                  Plaintiff,<br><br>        vs.<br><br>ST. JUDE MEDICAL, INC.; ST. JUDE MEDICAL S.C., INC.; PACESETTER, INC., dba ST. JUDE CARDIAC RHYTHM MANAGEMENT DIVISION; and DOES 1-10,<br><br>                  Defendants.<br>_____ | CASE NO.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br>_____ |

## I.  <u>JURISDICTION</u>

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

COMPLAINT AND DEMAND FOR JURY TRIAL          - 1 -

## II.  INTRADISTRICT ASSIGNMENT

2.    Assignment to the Western Division is appropriate because the majority of claims and certain of the transactions, acts, practices and courses of business alleged below occurred within the Central District of California, including Los Angeles, California.

## III.  INTRODUCTION

3.    Plaintiff brings this Complaint against St. Jude Medical, Inc., St. Jude Medical S.C., Inc., and Pacesetter, Inc. dba St. Jude Cardiac Rhythm Management Division (collectively referred to as "St. Jude" or "Defendants") for injuries caused by manufacturing defects in the St. Jude Riata and Riata ST Leads (hereinafter referred to as "Riata Leads" or "Leads").  Plaintiff alleges that he was implanted with a defective Riata Lead and suffered injury.

4.    St. Jude manufactures a variety of medical devices in California to treat heart conditions including implantable cardiac defibrillators ("ICDs").  Wires called Leads, are attached to the ICD, then inserted through a major vein and attached directly to the muscle on the inside of the heart, thereby connecting the ICD to the heart.  Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and correct any irregular rhythms.

5.    St. Jude Medical introduced its Riata Leads into the U.S. Market beginning in 2002.  Approximately 227,000 Riata Leads have been sold worldwide since approved for marketing.  79,000 Riata Leads are estimated to remain active in the United States.

6.    Recently, the Food and Drug Administration (FDA) issued a Class I Recall for the following Riata Lead identification numbers:

Riata (8Fr): 1560, 1561, 1562, 1570, 1571, 1572, 1580, 1581, 1582, 1590, 1591, 1592; and Riata (7Fr): 7000, 7001, 7002, 7010, 7011, 7040, 7041, 7042 (collectively "Riata Leads").

///

///

///

COMPLAINT AND DEMAND FOR JURY TRIAL                - 2 -

# IV.  PARTIES

**A.    Plaintiff**

7.      Plaintiff John Bauer is a resident of the State of Illinois.

8.      Plaintiff Bauer was implanted with a Riata Lead identified as a 7000/65 in September, 2007, and removed on July 11, 2013.

9.      Plaintiff Bauer has suffered injury arising out of the same occurrences, and/or series of occurrences, in the manufacture and/or series of manufacture, and warnings of the Riata Leads such that common questions of law and/or fact are common to all plaintiffs in other related cases.  Further, Plaintiff has such claim, right and interest adverse to the Defendants in the controversy, the subject of the action as herein below alleged.  The foregoing conforms with Permissive Joinder of Plaintiff herein pursuant to Federal Rules of Civil Procedure, Rule 20(a)(1)(A) and (B).

10.      Plaintiff Bauer first learned about the defect in the Riata Leads implanted in him within two years of the filing of this action.

11.      As a result of the defects in the Riata Leads, Plaintiff has been injured and will continue to suffer physical, emotional, economic, loss of love, comfort, society, affection, and other damages according to proof for each Plaintiff as more specifically alleged below:

12.      Plaintiff Bauer, as a direct and proximate result of the premises alleged herein, has suffered physical pain, mental anguish, loss of income as a result of the original implantation in September of 2007. Such pain-and-suffering includes hospital stay, surgical opening of his body, suturing, scarring, and other medical procedures associated with the implantation of the defibrillator and leads. Such pain continued thereafter. Plaintiff was forced to take various medications which caused adverse reactions to his body as outlined below. Plaintiff continued to suffer mental anguish associated with the reliance and concern of the medical effectiveness and viability of the foreign objects implanted in his body. Plaintiff suffered costs and medical expenses associated with the surgery and recovery herein alleged in an amount according to proof at trial.

13.      Plaintiff Bauer has suffered and continues to suffer shortness of breath, pain in

his chest, open-heart surgery, stress, discomfort, disfigurement, pain on left ribs from said surgery. He has continued to take a lot of medications causing adverse reactions to his body, loss of social life and earning capacity.

14. Plaintiff Bauer has been unable to work as a direct and proximate result from the surgery of implantation and the medications necessary be taken thereafter such that he suffered financial loss and earning capacities in an amount according to proof at trial.

15. Plaintiff Bauer was made aware of the recall of the medical device in his body in around 2013 and as a proximate result thereof suffered severe mental anguish, fear, and concern that he had a defective and recalled leads in his body and that it might stop his heart and cause severe injury or death.

16. Plaintiff Bauer, as a result of the findings of failure of the leads, was required to undergo removal surgery on July 11, 2013. Prior to removal, plaintiff Bauer suffered multiple fluoroscope procedures impairing his health with radiation, increased lead impedance, and electrical abnormalities resulting in numerous unwarranted electrical shocks to his body and associated mental anguish, and fear leading up to July, 2013.

17. Plaintiff Bauer suffered further surgery for removal of the complained of medical devices, pain and suffering associated with the surgery and invasion of his body, mental anguish and fear associated thereto, loss of earnings and earning capacities now and in the future, pain and suffering of recovery from surgery, scarring, and removal of the medical devices complained of herein.

18. Plaintiff Bauer continues to suffer pain and suffering, mental anguish regarding his health and condition of his heart, loss of earnings and earning capacity, medical expenses and costs as hereinabove alleged as a result and proximate cause of the actions of Defendants herein complained according to proof at trial.

**B.  Defendants**

19. Defendant St. Jude Medical, Inc. is a Minnesota Corporation that is headquartered in St. Paul, Minnesota, at One St. Jude Medical Drive, St. Paul, Minnesota 55117.

COMPLAINT AND DEMAND FOR JURY TRIAL          - 4 -

20.    Defendant St. Jude Medical S.C., Inc. is a Minnesota Corporation that is headquartered in St. Paul, Minnesota, at One St. Jude Medical Drive, St. Paul, Minnesota 55117

21.    Defendant St. Jude Medical manufactures medical devices that are sold in more than 100 countries around the world and experienced net sales of over $5.6 billion in 2011. Those sales include purchases in the State of California by and from residents of the State of California.

22.    Defendant Pacesetter, Inc. ("Pacesetter") is a Delaware corporation with its principal place of business at 15900 Valley View Court, in Sylmar, California.  Pacesetter, doing business as St. Jude Medical Cardiac Rhythm Management Division, develops, manufactures, and distributes cardiovascular and implantable neurostimulation medical devices, including the Riata and Riata ST leads at issue here.  Pacesetter operates as a wholly owned subsidiary of St. Jude Medical, Inc.  Prior to 1994, Pacesetter was known as Siemens Pacesetter, Inc.

23.    Pacesetter also holds the trademark for Riata.  Specifically, on September 7, 2001, Pacesetter filed a federal trademark registration. The United States Patent Trademark Office (USPTO) issued the RIATA trademark, serial number 76310892, to Pacesetter on November 5, 2002.  The correspondent listed for RIATA is Steven M. Mitchell of Pacesetter, Inc., 15900 Valley View Court, Sylmar CA 91342. The RIATA trademark is filed in the category of Medical Instrument Products. At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority and on behalf of each other Defendant.  During the relevant times, Defendants possessed a unity of interest between themselves and St. Jude Medical exercised control over its subsidiaries and affiliates.  As such, each Defendant is individually, as well as jointly and severally, liable to Plaintiff for Plaintiff's damages.

///

///

///

COMPLAINT AND DEMAND FOR JURY TRIAL            - 5 -

24.     Upon information and belief, Defendants expected or should have expected their actions to have consequences within the State of California, and derived substantial revenue from interstate commerce within the California.

## V.     JURISDICTION AND VENUE

25.     Venue is proper in the current court since that the original manufacture of the Riata Leads occurred in the County of Los Angeles, State of California, the acts of the Defendants complained of herein occurred in the State of California, and the damages sustained by Plaintiff is within the jurisdiction of the United States District Court, Central District of California. Plaintiff therefore sues such Defendants by such fictitious names, and Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained. Plaintiff is informed and believes, and thereon alleges that each of the Defendants, DOES 1 through 50, inclusively, are responsible under law in some manner, negligently, in warranty, strictly, or otherwise for the damages and injuries suffered by Plaintiff.

## VI.     FACTUAL ALLEGATIONS

### A.     Brief History Of The Heart Devices

26.     A number of devices designed to detect and treat abnormally fast and irregular heart rhythms and to provide pacing for improper heart rhythms are available from St. Jude Medical and other manufacturers, including Implantable Cardiac Defibrillators (hereinafter "ICDs").

27.     In 1980, termination of human arrhythmias with ICDs was reported in the New England Journal of Medicine.  Thereafter, a number of devices were approved and manufactured to detect and treat abnormally fast and irregular heart rhythms and to provide pacing for improper heart rhythms.  ICDs include pacemakers as well as defibrillators. Pacemakers are used primarily to correct slow heart rates.  Defibrillators detect and correct both fast and slow heart rates.  Using the pacemaker and defibrillator function, an ICD can correct slow heart rates, pace rapid heart rates, and administer a shock to stop the heart and allow for a return to an appropriate rhythm.

28.    ICDs are designed to be implanted primarily under the skin of the chest wall. The device's power source, or pulse generator, is implanted in a pouch formed in the chest wall generally over the left pectoral muscle.

29.    Generally, wires, called leads, act to conduct the electrical impulses between the heart and the ICD.  Low voltage pacing therapy to treat slow heart rhythms is provided through pace-sense electrodes.  High voltage shocks for defibrillation are provided through high voltage conductors.  Typically, high voltage leads are inserted through a major vessel and attached directly to the muscle on the inside of the heart.  Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and can transmit an electric shock from the ICD to abort dangerous heart rhythms or pace the heart at a normal rhythm.

30.    Any failure that compromises the ability of the lead to conduct electrical signals will result in a failure of the ICD to perform properly.  Lead failures may include externalization of the conductors, abrasion, fractured wires, insulation loss, loss of ability to capture, changes in electrical characteristics in the ventricle chamber, abnormal lead impedance, sensing failure, and changes in tissue conductor interface.

31.    Such devices are used in patients, like the Plaintiff, who have arrhythmias or irregular heartbeats that are considered life-threatening. Plaintiff with these medical problems include patients who are at risk for ventricular fibrillation (rapid, ineffective contraction of the ventricles of the heart), ventricular tachycardia (excessively rapid heartbeat) that is poorly controlled with medication. These arrhythmias or irregular heartbeats can result in the loss of consciousness or death, unless the patient receives therapy from an appropriate device to put the heart back into a more appropriate cardiac rhythm.

32.    If an implanted ICD and lead operate properly, the system can save a patient's life. Any failure that compromises the ability of the lead to conduct electrical signals will result in a failure of the ICD to perform properly. Lead failures may include fractured wires, bending, insulation loss, loss of ability to capture changes in electrical characteristics in the

ventricle chamber, abnormal lead impedance, sensing failure and changes in tissue conduct interface. If either the ICD or the lead fails to operate, the patient may die within minutes.

**B.**      **The Regulatory Approval Process Generally**

33.     A pre-market approval application ("PMA") must be submitted to the FDA for any Class III medical device.  *See* 21 U.S.C. 515(b); 21 CFR §814.3(e).  A PMA must contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue.  A PMA and/or PMA Supplement application must provide:

        a)      proposed indications for use;

        b)      device description including the manufacturing process;

        c)      any marketing history;

        d)      summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk considerations);

        e)      methods used in manufacturing the device, including compliance with current good manufacturing practices; and

        f)      information relevant to an evaluation of the safety and effectiveness of the device known to or that should reasonably be known to the manufacturer from any source, including commercial marketing experience.

**C.**      **The Regulatory Approval Process Specific to the Riata Leads**

34.     On March 11, 2002, the FDA, pursuant to St. Jude Medical's application number P950022/S014, approved the Riata Series 1500 Defibrillation Lead System.  (FDA PMA Database.)  This approval applied to Riata Model Numbers 1570, 1571, 1580, and 1581.

35.     Relying upon St. Jude's representations about the "state-of-the-art" nature and ease-of-use of the Riata Leads, physicians began broadly using the Riata Leads instead of other lead models.

36.     On January 23, 2003, the FDA, pursuant to St. Jude Medical's application number P950022/S015, approved an extension of the shelf-life of the Riata Leads.

37.     On March 25, 2003, St. Jude Medical added two new models to the Riata Series (Model No. 1572 and 1582), when the FDA approved application number P950022/S016.

38.     On April 12, 2004, the FDA approved St. Jude Medical's application number P950022/S018, a modification to the Riata defibrillation lead family to include integrated bipolar leads (Models 1560, 1561, 1562, 1590, 1591, and 1592).

39.     In May of 2005, a series of applications for manufacturing modifications were approved by the FDA. These requests involved "dimensional changes" to the Riata Leads, changes from welding to crimping connectors, changes from manual to automated processes, as well as changes to the order of the manufacturing steps for the crimping process, and "changes to the stylet ring and header coupling". *See*, application numbers: P950022/S020; P950022/S021; P950022/S022; P950022/S019; and P950022/S023.

40.     On June 3, 2005, the FDA approved the Riata ST Lead Models 7000, 7001, and 7002 under application number P950022/S024.

41.     In March of 2006, the FDA approved the following changes to the Riata Leads: (1) modifications to the Riata ST Models 7000, 7001, and 7002 active-fixation defibrillation leads to change the geometric profile of the inner coil and add white pigment to the medical adhesive used for shock coil backfill; (2) modifications to the Riata ST Models 7000, 7001, and 7002 leads to create an active-fixation integrated bipolar lead. These devices, as modified, are marketed under the trade names Riata ST Models 7010, 7011, and 7012 and are indicated for use with compatible pulse generators; and (3) modifications to the Riata ST Models 7000, 7001, and 7002 to create a passive fixation and a passive fixation integrated bipolar lead. These devices, as modified, will be marketed under the trade names Riata ST Models 7040, 7041, and 7042 (passive fixation) and Riata ST Models 7050, 7051, 7052 (passive fixation integrated bipolar) and are indicated for use with compatible pulse generators. These changes were all included in application numbers P950022/S027 and P950022/S028.

42.     In November 2006, the FDA approved St. Jude Medical's application to change the supplier for the DR-1 Boot component of its Riata Leads.  (P950022/S031).

43.     In December 2006, the FDA approved St. Jude Medical's application for a helix attachment modification for the Riata 1580, 1581 and 1582 leads as well as a crimp-weld coupling modification for the Riata and Riata ST lead families.  (P950022/S032).

44.     In February 2007, the FDA approved St. Jude Medical's application to add an automated trimming fixture to trim excess silicone adhesive on the shock electrodes during production of the Riata ST family of leads. (P950022/S033).

45.     In March 2007, the FDA approved St. Jude Medical's application for  changes to their Riata Leads: (1) Modification to the crimp slug weld tab; (2) Modification to the distal header assembly; (3) Modification to the PTFE liner in the IS-1 connector leg; (4) Removal of the PTFE liners in the two DF-1 connector legs; (5) Addition of a DF-1 plug accessory to the lead package; (6) Addition of an extra-soft stylet accessory to the lead package; (7) Minor modifications to the User Manual; and (8) Modified radius specification for the spring stopper component.  (P950022/S034).  The FDA also approved a change in the supplier of the front seal component (P950022/S035), added an "alternative welding process."  (P950022/S036), and added alternate vendor of the molded connector boot for the manufacturer of Riata ST Leads (P950022/S037).

46.     In June 2007, the FDA approved St. Jude Medical's application to change the suppliers of their connector rings and inner crimp sleeve components.  (P950022/S038, P950022/S039, P960013/S031, and P960013/S032).

47.     In October 2007, the FDA approved St. Jude Medical's application for an alternate supplier of ETFE coated cables.  (P950022/S043).

48.     In December 2007, the FDA approved St. Jude Medical's application to change the "shock coil backfill manufacturing process."  (P950022/S046), to extend the time between plasma treatment and application of medical adhesive. (P950022/S047), and to alternate oven settings during processing of the shock coils. (P950022/S048).

COMPLAINT AND DEMAND FOR JURY TRIAL           - 10 -

49.     In May 2008, the FDA approved St. Jude Medical's application to transition the manufacturing site located at Steri-Tech, Inc., Salinas, Puerto Rico for Ethylene Oxide sterilization of the pacemakers, ICDs and leads.  (P950022/S045).

50.     In July 2008, the FDA approved St. Jude Medical's application to transition the manufacturing of the Riata Leads to a plant in Arecibo, Puerto Rico. (P950022/S051).

51.     In June 2009, the FDA approved St. Jude Medical's application for an automated heat shrinking process.  (P950022/S055).

52.     In September 2009, the FDA approved St. Jude Medical's application for a change in temperature and humidity cure operation, and process modifications of the DR-1 connector pin on the Durata, Riata, Riata ST and Riata ST Optim families of leads. (P950022/S064) and (P950022/S063).

53.     In January 2010, the FDA approved St. Jude Medical's application for a change in the process water system monitoring frequency and locations at Arecibo, Puerto Rico manufacturing facility. (P950022/S068)

54.     In May 2011, the FDA approved St. Jude Medical's application for approval of a manufacturing site at St. Jude Medical Puerto Rico LLC in Arecibo, Puerto Rico. (P950022/S067).

**D.    Manufacturing Defects with Regard to Riata Leads**

55.     From 2005-2010 St. Jude applied for over 27 manufacturing or process changes to the Riata Leads.  The FDA approved these changes in a PMA and multiple supplements. Upon information and belief, St. Jude failed to manufacture the Riata Leads consistent with these approved changes, thereby creating a defective product.

56.     In general, the subject leads consist of a lead wire or cable coated with ethylene tetrafluoroethylene (ETFE) inserted into an insulating lead tube believe to be made from poly tetrafuoroehylene (PTFE).  Upon information and belief, one of these defects includes inconsistent insulation diameters surrounding the individual electric conductors. On information and belief, insulation diameters are required by the PMA and federal

requirements to be consistent. Failure to manufacture uniform insulation diameters leads to abrasion at thinner insulation sites, leading to device failure.

The inconsistency in the application, preparation, and manufacturing process of the ETFE coating of the lead wires or cables results in roughness, absence of coating, bubbles, valleys, inconsistent cross-section diameters and foreign materials, among other things, on the surface of the lead wire creating a surface of the coating which is abrasive, cutting, and interacts with the inside surfaces of the lead tube insulation to cause failure and breach of the coating of the wire or leads as well as failure, penetration and breach of the tube insulation. In addition, such inconsistency in the application, preparation and manufacture of the ETFE coating of the lead wires or cables results in increased stiffness, brittleness, lack of flexibility, and relative movement between the wire or cables and the lead tube insulation resulting in abrasive cutting, penetration, and breach of the lead tube insulation.

The inconsistency in the manufacture, chemical composition, and preparation of the insulating lead tube, in addition to inconsistent insulation diameters, has created rough and inconsistent interior diameter surfaces, thin and thick wall areas of uneven distribution of chemical composition resulting in susceptibility to abrasive failure, brittleness, lack of flexibility, cracking, failure of insulation properties, and abrasive failure interaction due to relative movement of the tube insulation with the interior wires and leads resulting in abrasive cutting, penetration, and breach of the lead tube insulation.

57. A natural process of abrasion occurs *in situ* with the insulation surrounding the lead wires or electrical conductors. It is foreseeable that such abrasion will occur with the insulation surrounding the lead wires and the bad wires after implantation. As a result, the lead wires protrude through the insulation, causing them to be in contact with materials and fluids that can prevent the proper functioning of the ICD. This protrusion is called "externalization."

58. The breach of insulation and externalization of the lead wires on the Riata Leads can cause the Leads to short, and to transmit incorrect information or noise to the pacemaker/defibrillator thereby causing it to produce unnecessary and very painful shocks of

COMPLAINT AND DEMAND FOR JURY TRIAL          - 12 -

electricity, or alternatively, to fail to communicate with the pacemaker/defibrillator at which point the life-saving therapies of the device are unavailable.

59.    Additionally, St. Jude applied and received approval for multiple changes to the cure and sterilization processes used in the manufacture of the Riata Leads.  Upon information and belief, St. Jude, failed to comply with the approved methods of curing and sterilization during the manufacture of the Leads.  Upon information and belief, failure to follow the approved cure and sterilization processes resulted in reduced tensile strength of the silicone insulation.

60.    St. Jude applied and received approval for numerous modifications to the welding and crimping procedures in the manufacture of the Riata Leads.  Upon information and belief, the PMA and Conditions of Approval required the application of a controlled, uniform degree of force when applying the crimp.  Upon information and belief, failure to crimp with a controlled, uniform, degree of force, resulted in insecure crimps, lead wire length differences both longer and/or shorter than specification for the length of the Lead.

61.    The failure to assemble, crimp, manufacture and produce, as herein before alleged, has resulted in increased tension and/ or compression of the lead wires and lead tube insulator causing abrasion and friction between the lead wires and lead tube insulator, lack of flexibility of the assembly, resistance to flex resulting in relative movement between the lead wire and the lead tube insulator, failure of the lead wire and lead tube insulator and thus resulting in exposure of the lead wire outside of the lead tube insulator during use of the product in human beings.

62.    Upon information and belief, St. Jude committed to the FDA that the Riata Leads would be manufactured in such a way as to have a useful life years longer than the leads actually have. St. Jude's failure to manufacture the leads such that they meet the useful life is a manufacturing defect that would not have occurred had the leads been manufactured as St. Jude committed to the FDA.

63.    St. Jude applied and received approval for original manufacturing processes, verification procedures, use of calibrated and specialized manufacturing equipment, training

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 13 -

procedures for personnel, testing procedures for manufactured samples, specific protocols, recordkeeping procedures, reporting procedures to the FDA, verification by subsequent inspection and testing, establish and maintain a design history file for each type of device, establish and maintain procedures for implementing corrective and preventive action and further received approval for multiple changes for the various items identified, among other things. That, in fact, St. Jude failed to and did not comply with numerous specific requirements, among others, in the manufacturing process as follows:

- Inadequate inspections of product assembly, product components, and product quality during manufacture and assembly without proper documentation of said inspections.

- Changes in CAPA procedures adversely affecting the manufacture and assembly of the finished device and leads.

- Inadequate CAPA systems including CAPA PIR 10 – 007.

- Leadholder differences in manufacture resulting in different lead lengths, coatings, assembly, processing, attachments, crimping and manufacture.

- Inadequate calibration procedures for tolerances and out of tolerance verification, inspection, correction to the manufacturing equipment.

- Inadequate and lack of control of design transfer into manufacturing processes resulting in the finished product and additionally without verification and/or documentation.

- Inadequate training of personnel in the manufacturing process quality control, assembly, procedures, protocols, checking of assemblies, inspection of assemblies, final inspection of assemblies, final testing of assemblies, and packaging.

- Inadequate failure report mechanism from users of the product. Additionally, the procedures for implementing corrective and preventive actions were not defined;

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 14 -

- Design reviews were not performed at appropriate times nor did they follow the review schedule.
- Procedures were not established for the validation or verification, review, and approval of design changes resulting in manufacturing changes and their implementation. There is no written procedures describing the review and approval process for such manufacturing changes, a verification plan was not prepared when such manufacturing changes required a verification plan.
- Defendant failed to follow good manufacturing procedures.
- Defendant failed to establish and maintain a design history file for each type of device.
- Defendant failed to report to the FDA no later than 30 calendar days after the day that it received or otherwise became aware of information, from any source, that reasonably suggests that the leads or similar leads would be likely to cause or contribute to a death or serious injury.
- Defendants' Procedure #602727, Product Experience Report Handling, PR LLC, 4 Puerto Rico, fails to require complete documentation of activities conducted to ensure a timely investigation of failed leads.
- Defendants' device packaging and/or shipping containers are not manufactured and constructed to protect the device from alteration or damage during processing, storage, handling, and distribution.

64.    Upon information and belief, one of the failures to follow specifications, federal regulations, and/or the PMA includes the failure to manufacture the internal conductors, or cables, at sizes consistent with the specifications.  This failure results in increased movement of the conductors, or cables, within the insulation thereby causing inside out abrasion.

65.    Upon information and belief, one of these defects also includes inconsistent insulation diameters surrounding the electric conductors, also known as cables. On information and belief, insulation diameters are required by the design specifications, PMA, and/or federal requirements to be consistent. Failure to manufacture insulation diameters

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 15 -

consistent with the specifications leads to increased movement of the cables within the outer silicone as well as an increased risk of abrasion at thinner insulation sites, leading to an increased risk of device failure.

66.    Further, upon information and belief, one of the failures to follow specifications, federal regulations, and/or the PMA includes St. Jude's failure to consistently apply a lubricious interface inside the lumen between the inner and outer insulation in violation of the design specifications and/or PMA.  Upon information and belief this inconsistent application may have led to increased friction within the lead body, promoting abrasion and/or externalization.

67.    Additionally, St. Jude applied for and received approval for multiple changes to the cure and sterilization processes used in the manufacture of the Riata Leads.  Upon information and belief, St. Jude, failed to comply with the approved methods and/or specifications of curing and sterilization during the manufacture of the Leads.  Upon information and belief, failure to follow the approved cure and sterilization processes resulted in reduced tensile strength of the silicone insulation.

68.    Upon information and belief, St. Jude processed the leads in a solution which caused the cables and/or conductors to stretch and then vibrate when exposed to electrical charge thru the silicone, further increasing the risk of abrasion to the leads.  Upon information and belief, this process failed to follow the approved specifications, and procedures set forth in the PMA and/or federal regulations.

69.    Upon information and belief, St. Jude also failed to consistently trim and/or remove excess adhesive and/or silicone from the outer lead body consistent with approved specifications and procedures set forth in the PMA and/or federal regulations.  The inconsistencies in this removal and failure to follow specifications and procedures set forth in the PMA and/or federal regulations results in both inconsistent thickness and less smooth insulation both of which contribute to the abrasion of the lead.

70.    Finally, St. Jude applied and received approval for numerous modifications to the welding and crimping procedures in the manufacture of the Riata Leads.  Upon

information and belief, a controlled, uniform degree of force was required when applying the crimp. Upon information and belief, failure to crimp with a controlled, uniform, degree of force, resulted in insecure crimps over the length of the Lead, which also leads to increased movement of the lead and diminishes the integrity of the insulation – both of which lead to abrasion.

71. These defects result in abrasion which occurs in situ with the insulation surrounding the cables and/or conductors. As a result, the cables may protrude through the insulation, causing them to be in contact with materials and fluids that can prevent the proper functioning of the ICD. This protrusion is called "externalization."

72. The breach of insulation and externalization of the cables and/or conductors on the Riata Leads can cause the Leads to short, and to transmit incorrect information or noise to the pacemaker/defibrillator thereby causing it to produce unnecessary and very painful shocks of electricity, or alternatively, to fail to communicate with the pacemaker/defibrillator at which point the life-saving therapies of the device are unavailable.

73. Finally, upon information and belief, Defendants failed to adequately inspect and/or test the leads and their component parts to ensure consistent with approved specifications and procedures set forth in the PMA and/or federal regulations.

**E.    The FDA Inspections Prior to Recall of the Riata Leads**

74. Failure of the Riata Leads was apparently unrelated to patient age or sex, ICD indication, the primary heart disease, left ventricular ejection fraction, or lead tip position, suggesting that manufacturing problems are responsible for the failure of the devices.

75. Investigations by the FDA specifically in 2009 and 2012 have found numerous manufacturing deficiencies which are also well known to St. Jude. (RJN, Exh. A.)

76. Among other things, in 2009 the FDA conducted a Form 483 inspection and found the following deficiencies in the California plant where Plaintiff's Riata Leads were manufactured:

- St. Jude failed to include all information that was reasonably known to the manufacturer on an MDR Report in violation of 21 CFR 803 *et seq.*

- St. Jude failed to timely submit MDRs to the FDA and such submissions were significantly past the mandatory reporting timeframes without written explanation in violation of 21 C.F.R. 803 *et seq.*

- St. Jude failed to define the procedures for implementing corrective and preventative actions in violation of 21 CFR 820 *et seq.* Specifically, the Standard Operating Procedure for risk analysis failed to define the methodology for obtaining the Probability of Occurrence that is used in Risk evaluations resulting in inconsistent risk analyses.

- St. Jude failed to review their sampling methods for adequacy of their intended use in violation of 21 CFR 820 *et seq.* Specifically, the procedure "Receiving Inspection Sampling Program" allows components to be accepted without receiving inspections and review of vendor certificates (Dock to Stock method). The procedure did not have a monitoring program for receiving components that were subject to Dock to Stock methods. As of June 23, 2009, a significant number of "critical components for defibrillation leads were Dock to Stock components." Also, the sections of "Dock to Stock General Requirements" and "Dock to Stock Part Declassification" were purged without written justifications.

- St. Jude failed to perform design reviews at appropriate times in violation of 21 CFR 820 *et seq.* Specifically, Design Phase reviews were not conducted as required by the procedure for Global Product Development Protocol and the Product Development Plan. Additionally, team meeting minutes were not maintained as required.

- St. Jude failed to perform a complete risk analysis in violation of 21 CFR 820 *et seq.* Specifically, the Failure Mode, Effects, and Criticality Analysis (FMECA) did not include all drawings and St. Jude was unable to explain why component drawings were not evaluated for failure mode, effect, and criticality analysis.

COMPLAINT AND DEMAND FOR JURY TRIAL          - 18 -

The design FMECA analysis for components and top assembly drawings were part of the risk analysis for the Riata leads.

- St. Jude failed to establish procedures for the validation or verification review, and approval of design changes before their implementation in violation of 21 CFR 820 *et seq.* Specifically, St. Jude had no written procedure describing the review and approval process of the design verification plan and report, when design changes require a verification plan.

- St. Jude failed to resolve discrepancies noted at the completion of design verification in violation of 21 CFR 820 *et seq.* Specifically, the review of Quality Test Report (QTR) 1403 for Riata Series 1500 shows someone who reviewed the data sheets had made a change to the specification of DC resistance on the Qualification Test Data Sheets for Composite Lead Tensile Test, but the reason for the discrepancy and reason for the change were not discussed in the QTR or meeting minutes.

77. The FDA found similar St. Jude deficiencies in 2012 when it inspected the California plant where the Riata Lead was manufactured. Indeed, the 2012 FDA report identifies inadequacies in the machine validations "installed from 1999-2011." And, in January 2013 – based on its 2009 and 2012 inspections – the FDA sent a warning letter to St. Jude and concluded that the Riata Lead is "adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or facilities or controls used for, their manufacture . . . are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820." The cited section of the Code of Federal Regulations contains Current Good Manufacturing Practices ("CGMP") that govern St. Jude in manufacturing the Riata Lead. The FDA noted that St. Jude's specific regulatory violations "may be symptomatic of serious problems in your firm's manufacturing and quality management systems" associated with the manufacture of Plaintiff's Riata Lead.

78. And twice in 2012, the FDA notified health professionals that the Riata Lead

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 19 -

was prone to "premature failure."

**F.**     **Recall Of Several Riata Leads**

79.     On December 15, 2010, St. Jude Medical published a "Dear Doctor" letter regarding its Riata Leads.  In the 2010 letter, St. Jude indicated that issues with defects in the insulation have been identified in the Riata Lead Models 1560, 1561, 1562, 1570, 1571, 1572, 1580, 1581, 1582, 1590, 1591, 1592, 7000, 7001, 7002, 7010, 7011, 7040, 7041, and 7042.

80.     Specifically, St. Jude states that "the Riata and Riata ST Family of Silicone Leads have exhibited an insulation abrasion rate of 0.47% over nine years of use." Additionally, St. Jude noted that the silicone used on these leads was "vulnerable to abrasion."

81.     In the 2010 Dear Doctor Letter, St. Jude indicated that Lead insulation abrasion had been associated with:

        a)     Oversensing (leading to inhibition of pacing or inappropriate high voltage therapy);

        b)     Undersensing;

        c)     Loss of capture;

        d)     Changes in pacing and/or high voltage lead impedances; and

        e)     Inability to deliver high voltage therapy.

82.     Despite the dangers associated with these leads, St. Jude did not initiate a voluntary recall of the leads at that time.  Rather, St. Jude simply noted that it was "phasing-out" all Riata Lead models by the end of 2010.

83.     On November 28, 2011, St. Jude Medical published a second Dear Doctor letter relating to the same set of Riata Lead Models as the 2010 Dear Doctor letter.

84.     The November 28, 2011, Letter updated the previously published failure rates for the Riata Leads, indicating that it had increased to 0.63% from its 2010 rate of 0.47%. Again, despite the dangers associated with these leads, St. Jude did not initiate a voluntary recall.

COMPLAINT AND DEMAND FOR JURY TRIAL               - 20 -

85.     On December 21, 2011, the FDA reclassified St. Jude's Dear Doctor advisories to a Class I Recall.

86.     A Class I Recall is the most serious level of recall and is defined as: a situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death.

87.     Specifically, the FDA indicated that the reason for the recall was that "failures associated with lead insulation abrasion on the St. Jude Medical Riata and Riata ST Silicone Endocardial Defibrillation Leads may cause the conductors to become externalized. If this occurs, this product may cause serious adverse health causes, including death."

**G.    Physicians Expose the Riata Lead Defects**

88.     Beginning in September 2011, Dr. Robert Hauser of the Minneapolis Heart Institute Foundation (MHI), began researching the FDA's MAUDE database for reported deaths related to the St. Jude Riata Leads.

89.     In a manuscript sent to the *Heart Rhythm* Journal in March 2012, Dr. Hauser detailed his research and conclusions comparing the failure rates of the St. Jude Riata Leads to the reported failure rates of a competitor's leads.  Hauser, R.G., Abdelhadi, R., McGriff, D., Retel, L.K., Deaths Caused by the Failure of Riata and Riata ST Implantable Cardioverter-Defibrillator Leads (March 4, 2012) (as yet unpublished manuscript) (on file with author).

90.     In his manuscript, Dr. Hauser indicated that the reports showed that 31% of the deaths involving the Riata Leads were lead-related, whereas 8% of the deaths involving the competitor's lead were found to be lead-related.  *Id.*  It is important to note that adverse events are often under-reported.  *Id.*

91.     Additionally, Dr. Hauser noted that "Abnormal high voltage impedances were the hallmark of catastrophic Riata and Riata ST lead Failure, often resulting in failure to defibrillate."  *Id.*   Finally, Dr. Hauser concludes that the Riata Leads are prone to high-voltage failures that have resulted in multiple deaths.  *Id.*

92.     On March 8, 2012, Dr. Hauser's article entitled "Here we Go Again – Another

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 21 -

Failure in Postmarketing Device Surveillance" was published in the New England Journal of Medicine.  This article exposed the increased harm in failing to have an accurate, active post-market reporting mechanism for medical devices and advocated for greater research and review of medical device failures in order to better protect patients.  Robert G. Hauser, *Here We Go Again – Another Failure in Postmarketing Device Surveillance*, 366 NEW ENG. J. MED. 873, 873-75 (2012).

93.     In May 2012, Dr. Hauser published additional findings regarding the Riata Lead insulation defects in the Heart Rhythm Journal. Hauser, R.G., McGriff, D., Retel, L.K., Riata *Implantable Cardioverter-Defibrillator Lead Failure: Analysis of Explanted Leads with a Unique Insulation Defect* (May 2012).

**H.     Facts Related to Failure to Warn**

94.     The 2009 inspection by the FDA also revealed that Defendants had deficiencies in the handling of complaints, making Medical Device Reporting (MDR) determinations, CAPA procedures, and receiving protocols.

95.     These failures violated 21 CFR 803.50(b)("[f]ailure to submit MDR reports containing all information reasonably known to them in accordance with the provisions of 21 CFR 803.50(b)").  Specifically, the inspection report stated that St. Jude Medical's complaint files noted adverse events that St. Jude internally evaluated but did not report to the FDA.

96.     As part of the inspection, the FDA interviewed Nestor Kusnierz, Director of Regulatory Compliance.  According to the Report, Mr. Kusnierz is a 25 year veteran with St. Jude. His primacy task is to assure the inspection runs smoothly and within the firm's regulatory procedures.  Mr. Kusnierz answered questions regarding complaints and MDRs.

97.     During the inspection, Mr. Kuznierz provided an Excel spreadsheet to the FDA for all complaints for the Riata and Durata lead models dating back to 2002. This represented the time period from device approval through June 9, 2009 and totaled 8,463 complaints.  For all complaints identified as "perforation, patient", it was indicated that an MDR had been submitted.  However, the FDA adverse event database contained only 3,689 MDRs from the firm for these devices during this time period.

98.     Prior to the inspection, 32 MDRs were identified from the adverse event database as possibly Riata perforation events, and the complaint files for these were requested and reviewed during the inspection.

99.     Review of these complaint files and the associated Medical Device Reports (MDRs) revealed that in some cases Defendants failed to submit MDR reports containing all information reasonably known to them in accordance with the provisions of 21 CFR 803.50(b). Specifically, the complaint files show that complainants reported perforation adverse events for the Riata and Durata devices, but these events were not reported as "perforations" in the associated MDRs submitted to FDA by the manufacturer.  Additionally, perforation was not identified in the submitted Form 3540A either in the patient or device problem codes.

100.    A sampling of 8 complaints that were identified as by Defendants as  "capture anomaly," "dislodgment" or "patient discomfort"  were also retrieved from the MAUDE database by device serial number for further review.  Six of these reports "in fact described a suspected perforation and it could not be ruled out as possible for the other two events."  "As the FDA noted in its EIR, "post-market surveillance by FDA is hampered when mandatory reporting terminology is not clear, accurate and consistent."

101.    Additionally, the 2009 Establishment Inspection Report noted that "complaints representing events that are MDR reportable were not promptly reviewed, evaluated and investigated by the designated individual per 21 CFR 820.198(d), and MDRs were not submitted within the mandatory reporting timeframes required by 21 CFR 803.50 for device manufacturers."  For example, "MDR # 2017865-2008-0044 provides a manufacturer aware date and perforation event in 2003.  The 3500A was submitted without explanation to FDA on January 10, 2008.  Similarly, MDR # 2017865-2008-00447 provides a perforation event date and manufacturer aware date in 2004, but the 3500A was also submitted without explanation to FDA on January 10, 2008."

102.    The EIR continues to state that additional review of the MDRs submitted from 2007 through June 2009 found no evidence that the perforation events described in the

COMPLAINT AND DEMAND FOR JURY TRIAL               - 23 -

medical or scientific literature were submitted to FDA as required by regulations and company procedures.

103.    Similarly, a 2011 report by an FDA Safety Officer, Jessica Paulsen, noted that Defendants' CAPAs limited the analysis to "externalized cables and [did] not include exposed cables or all other forms of abrasion, which FDA considers important contributors to the published rate of all abrasion presented in [Defendants'] November 2011 Product Performance Report (PPR)." The FDA also noted that the "published failure rate based on PPR is based only upon reported events and returned product analysis, and therefore underestimates the actual rate of occurrence."

104.    The FDA also noted that Defendants' "calculation of the proportion of leads associated with inappropriate high voltage shock delivery, based on their assumptions appear[ed] to have a clerical error" and required correction.

105.    The 2011 Report also notes numerous instances of underreporting and states that the terms "'externalized cable' or even "abrasion" may not be employed when it is a contributing cause to the reporter having been unaware that externalized cable occurred. The clinical presentation (noise, inappropriate therapy, no therapy, etc.) may be what is reported and not the diagnosis of the lead mechanical failure."

106.    The FDA further noted that while Defendants reported only "1 instance of 'inappropriate high voltage shock delivery' OSEL's analysis from last January counted 71 cases of inappropriate shock, noise, and/or over sensing (out of 172 inside-out abrasion cases)." OSEL further found that "nine out of the first ten instances reviewed for these three events were referred to as 'inappropriate therapy.'" Thus, OSEL concludes, Defendants "may under-estimate the actual number of inappropriate shocks due to their limiting terminology." Additionally, the Report notes that "some literature sources reviewed by FDA have published rate information that is greater than what is included in SJM's HHE."

107.    Continuing with the November 2011, Report, it is noted that "OSB identified a total of 794 reports of insulation abrasion, and 116 of those reports mentioned inside-out abrasion." The Report further notes that "the reports submitted by SJM to FDA concerned

externalized cables and abrasion failures are not up to date."

108.    MDRs are the mechanism by which the Food and Drug Administration receives significant medical device adverse events from **manufacturers, importers and user facilities**, so that problems can be detected and corrected quickly.

109.    The FDA publishes the adverse events and MDRs in a public, searchable database called the MAUDE database and updates the report monthly with "all reports received prior to the update." *See,* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/ cfMAUDE/search.cfm.  The general public, including physicians, and patients, may use the MAUDE database to obtain safety data on medical devices.   For example, Dr. Hauser published a study in the Heart Rhythm Journal that assessed the number of deaths associated with the Riata leads.  *See* Hauser et al.  *Deaths caused by the failure of Riata and Riata ST implantable cardioverter-defibrillator leads*.  Heart Rhythm, 2012 Aug; 9(8):1227-35.  Dr. Hauser's assessment was based on his search and analysis of the MAUDE database.

110.    Indeed, doctors reported abrasion problems with the Riata leads to St. Jude. However, doctors were left with the impression that such problems were rare because St. Jude did not adequately submit this information to the FDA and/or otherwise advise the public. Specifically, an October 2012 article in the Wall Street Journal reports that physicians including Dr. Alan Cheng, director of Johns Hopkins Medicine's arrhythmia service; Dr. Samir Saba, chief of electrophysiology at the University of Pittsburgh Medical Center; and Dr. Ernest Lau at the Royal Victoria Hospital in Belfast, Ireland, had encountered abrasion in the Riata leads between 2006 and 2009. However, when these doctors brought the incidents to the attention of St. Jude they were told by company officials and field representatives that the incidents were isolated.

111.    The Wall Street Journal further reported that St. Jude had been tracking the abrasion issue for "several years" and that abrasion became a focus of an internal St. Jude audit, which examined multiple instances of that type of failure before April 2008.[1]

---

[1] Christopher Weaver, St. Jude Riata Heart Device-Device Flaws Known For Years, Wall St. J., 10/11/12, at http://online.wsj.com/article/SB10000872396390444223104578036752346768278.html.

According to the article, St. Jude's internal audit concluded in 2008 that Riata had "potentially serious insulation problems including inside-out abrasion." The audit, which had been looking broadly at insulation problems by 2006, included a special section on inside-out abrasion, which cited examples of inside-out abrasion in at least two devices extracted from patients, as well as in lab testing. The report, which didn't address whether the problems resulted in injuries or deaths, said 32 of the 246 leads examined were damaged enough to inhibit lifesaving shocks. The company had sold more than 120,000 Riata leads in the U.S. by that time, and the risk of all abrasion-related failures appeared "remote," the audit said.

112.    Accurate reporting of adverse events is essential, as it serves to notify the public that a potential problem with the device exists, and can prompt an informed person or organization to develop a solution. The FDA and others, including the public, rely upon accurate and timely reporting of adverse events. Post-market surveillance by FDA is hampered when mandatory reporting terminology is not clear, accurate and consistent.

113.    The FDA 2009 inspection also revealed that Defendants failed to follow their procedure for product design developments of the Leads.

114.    As a result of these deficiencies, the FDA issued an eight-item FDA-483 Report on July 8, 2009. An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic Act and related Acts. FDA investigators are trained to ensure that each observation noted on the FDA Form 483 is clear, specific, and significant.

115.    Specifically, these deficiencies identified by the FDA in the Form 483 2009 included the following:

116.    Defendants failed to include all information that was reasonably known to the manufacturer on an MDR Report in violation of 21 CFR 803 *et seq.*

117.    Defendants failed to timely submit MDRs to the FDA and such submissions were significantly past the mandatory reporting timeframes without written explanation in violation of 21 CFR 803 *et seq.*

COMPLAINT AND DEMAND FOR JURY TRIAL          - 26 -

118.    Defendants failed to define the procedures for implementing corrective and preventative actions in violation of 21 CFR 820 *et seq.*  Specifically, the Standard Operating Procedure for risk analysis failed to define the methodology for obtaining the Probability of Occurrence that is used in Risk evaluations resulting in inconsistent risk analyses.

119.    Defendants failed to review their sampling methods for adequacy of their intended use in violation of 21 CFR 820 *et seq.*  Specifically, the procedure "Receiving Inspection Sampling Program" allows components to be accepted without receiving inspections and review of vendor certificates (Dock to Stock method).  The procedure did not have a monitoring program for receiving components that were subject to Dock to Stock methods.  As of June 23, 2009, a significant number of "critical components for defibrillation leads were Dock to Stock components."  Also, the sections of "Dock to Stock General Requirements" and "Dock to Stock Part Declassification" were purged without written justifications.

120.    Defendants failed to perform design reviews at appropriate times in violation of 21 CFR 820 *et seq.*  Specifically, Design Phase reviews were not conducted as required by the procedure for Global Product Development Protocol and the Product Development Plan.  Additionally, team meeting minutes were not maintained as required.

121.    Defendants failed to perform a complete risk analysis in violation of 21 CFR 820 *et seq.*  Specifically, the Failure Mode, Effects, and Criticality Analysis (FMECA) did not include all drawings and St. Jude was unable to explain why component drawings were not evaluated for failure mode, effect, and criticality analysis.  The design FMECA analysis for components and top assembly drawings were part of the risk analysis for the Riata leads.

122.    Defendants failed to establish procedures for the validation or verification review, and approval of design changes before their implementation in violation of 21 CFR 820 *et seq.*  Specifically, Defendants had no written procedure describing the review and approval process of the design verification plan and report, when design changes require a verification plan.

123.    Defendants failed to resolve discrepancies noted at the completion of design verification in violation of 21CFR 820 *et seq.*  Specifically, the review of Quality Test Report (QTR) 1403 for Riata Series 1500 shows someone who reviewed the data sheets had made a change to the specification of DC resistance on the Qualification Test Data Sheets for Composite Lead Tensile Test, but the reason for the discrepancy and reason for the change were not discussed in the QTR or meeting minutes.

124.    Additionally, the 2009 Establishment Inspection Report indicated that "complaints representing events that are MDR reportable were not promptly reviewed, evaluated, and investigated by the designated individual per 21 CFR 820.198(d)."

125.    The FDA also noted that training on complaint handling by Defendants' field staff needed improvement.  Specifically, "many products [were] returned for analysis without an associated complaint, although obtaining the reason for explant would not be expected to be difficult for the field staff attending procedures."

126.    Additionally, "review of the MDRs submitted from 2007 through June 2009 found no evidence that the events described in [medical or scientific literature] were submitted to FDA as required by regulations and company procedures."

127.    The FDA also reported that Defendants' Standard Operating Procedure for Global Risk Management (SOP 4.7.2) was inadequate as it related to "clinical risk in new product development and throughout the product life cycle, [and] was inadequate in that the procedure did not establish a methodology for obtaining a Probability of Occurrence used in Risk Evaluations."  Defendants' Product Improvement Requests (PIRs) demonstrated these inadequacies.

128.    The FDA noted that Defendants had the required written procedure to cover design changes.  However, according to the FDA, the reasons and justifications for design changes were not always properly documented.

129.    As part of the inspection, the FDA also requested Defendants' World Wide Product Disposition Review Board (WWPDRB) meeting minutes, which dated back to 2006. Specifically, the WWPDRB meetings were held to "discuss issues that had a Criticality value

of four or five.  The meeting minutes consisted of a brief summary, list of participating

members, and PowerPoint slides used for the presentation of issues."

130.    During the 2009 inspection, the FDA also inquired about the design controls

related to the Riata leads, including but not limited to Conceptual Design Review Reports,

Product Development Plans, Hazard Analysis, FME and FMECA's, Design Verification Test

Reports and Qualification Test Reports.

131.    On October 17, 2012, the FDA conducted a subsequent 483-inspection of

Defendants' Sylmar, California manufacturing facility and identified several deficiencies

including failures regarding design verification, complaint handling, CAPA procedures, risk

analyses, inspection/measuring/testing/calibration of equipment, document control, and

employee training.

132.    Also, A condition of approval of the Parts Manufacturing Authorization (PMA)

from the FDA for the Riata series of leads are "conditions of approval for implantable

defibrillators and programmers."  In summary, the conditions specifically require the

following:

A.    Submission of post-approval reports pursuant to 21 CFR 814.84 at

intervals of one year from date of approval of the original PMA. Included among other

things are (a) unpublished reports of data from any clinical investigation or nonclinical

laboratory studies involving the device and (b) reports in the scientific literature

concerning the device. Included are also requirements in order to assess continued

reasonable assurance of safety and effectiveness are to be reported, number of pulse

generators domestically implanted and the number of reported explants and that which

is not limited to adverse incidents but specifically any explants and death. Also

included is a breakdown of reported deaths in post-generated and non-post-generated

that's of those who have implants.

B.    Adverse reaction reports are required pursuant to 21 CFR 814.82(a)(9)

within 10 days after defendant receives or has knowledge of information containing

adverse reactions, side effects, injury, etc., that are attributable to the device and (1)

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 29 -

has not been addressed by the device labeling or (2) has been addressed by the device labeling, but is occurring with unexpected severity or frequency or (3) any significant failure to meet the specs established in the approved PMA that could not cause or contribute that or serious injury but are not correctable by adjustment or other maintenance procedures described in the approved labeling.

133.    Defendants, on or about July 25, 2001, had a prior history of similar manufacture and use of leads made by them with silicone rubber insulation.  Based on information and belief, defendants were thus aware of and had prior history and knowledge of anticipated failure rates of the similar Riata Leads containing silicone insulation since the silicone  insulation was known to fail, abrade, externalize and otherwise were defective in long-term use.

134.    In and around July 25, 2001, Defendants were aware pursuant to their submission of information and data to the Federal Drug Administration that prior history as reported in numerous scientific journals and scientific articles identified extensive complications with silicone-insulated leads including lead fracture, lead insulation damage, and failure during use in a short time after implantation.

135.    Prior to 2002, Defendants further had no prior knowledge of or experience with the design of the Riata Leads which involved the leads' use of cables for the high voltage conductors. The cable design was new to Defendants and they had no prior experience with them or their long-term use.

136.    In the original application for the Riata lead PMA in 2002, Defendants knew through their clinical studies of the Riata Leads which had begun in May 16, 2001 with 85 patients implanted by August 22, 2001 that they did not have sufficient long-term data of the leads viability, suitability for use in human beings, duration of leads viability in human beings, and other critical information. Defendants' data collection only continued through January 11, 2002 and their clinical investigation was only approximately eight months. As a result thereof, Defendants had no knowledge of the long-term use and dangers beyond eight months of the lead in human beings and specifically lead failure due to wire abrasion,

externalization of wires from insulation, externalized wire contacts with heart tissue causing defibrillator failure to function, failure to prevent heart arrhythmia, failure to transmit to the ICD computer needed electrical impulses and abnormal and unrequired electrical shocks to the non-distressed heart; all of the foregoing manifesting within a short period of time after implantation.

137.    Defendants failed as a proximate result thereof in their User Manuals or in their Labeling, to identify and warn the users and medical community that the long-term use of the leads had not been established nor did Defendants know how long the leads could be used in persons  or individuals without failure as identified above, without careful and frequent monitoring, and the dangers associated thereto. Defendants did not amend or provide further information in this regard until after the recall by the FDA in 2011.

138.    Defendants' Manuals, Labeling and User Instructions and Manuals were represented to be essentially a minimal modification from previous St. Jude Medical lead user manuals and added with small cosmetic changes. These documents contain generic listings of warnings of numerous conceivable adverse consequences including "breaching of the lead insulation" and negligently and defectively without explanation, instructions for determination or anticipation of such failures and/or when they would might occur.

139.    Defendants' User Manuals starting in 2002 provide a defective and negligent warning to use caution when handling the leads as it is designed to be pliable but will not tolerate excessive bending or stretching. There is no explanation, among other things, as to what failure is to be looked for if there was excessive bending or stretching and/or why this is a problem.  The effect of use of the leads on humans was not explained or warned.

140.    Defendants knew that bending or stretching the leads would lead to failure as explained in Paragraph 143, but failed to warn doctors, general public and Plaintiff of these facts prior to implantation of the leads into Plaintiff.

141.    In and around September, 2004, Defendants, with full knowledge that the silicon insulators (Riata) were inadequate for their intended use, began testing and study of polyurethane covered leads because they were stronger and would resist abrasion and

COMPLAINT AND DEMAND FOR JURY TRIAL                - 31 -

externalization which is one of the complained of modes of failure and defects in the subject Riata Leads complained of herein.

142.    Plaintiff alleges here on information and belief that Defendants were searching for a stronger and nonabrasive or non-externalizing insulation material for the leads as they had received knowledge of adverse reports of adverse events and failures of the silicate leads already implanted as identified herein as Paragraph 143.

143.    In May 27, 2005, Defendants applied to the Federal Drug Administration for a PMA to change the 1500 series Riata Leads to then be called the 1940 series of leads which change the lead insulation materials from silicone rubber to a silicone and polyurethane copolymer which they had tested.  In other respects, the leads were the same design.  Among other things, Defendants specifically represented to the FDA that "this combination of properties results in superior lead reliability."  Based on information and belief it is therefore alleged that Defendants thus had knowledge, had done tests, had extensive literature published in scientific journals, had reports of failures and information that their Riata insulation leads were failing, abrading and externalizing, and that the polyurethane insulator was determined by Defendants to provide superior leader reliability, robustness, and long-term useful life on or before May 27, 2005.

144.    In November, 2005, the FDA approved the new polyurethane leads now called the "Optima Insulation."  Defendants represented that the new leads will improve the robustness of the lead insulation and strengthen resistance to abrasion and externalization, among other things.

145.    Subsequent and thereafter of May, 2005, Defendants failed to warn, communicate, or otherwise amend their Riata labeling or manuals to doctors, the general public and Plaintiff herein, to reflect that a newer, stronger, more robust, and safer lead material had been developed and determined to prevent abrasion, externalization, failure and injury associated with the leads to be implanted in the future known as the Riata Leads which are the subject of the recall of 2011.

146.    Plaintiff alleges on information and belief that Defendants knew prior to

COMPLAINT AND DEMAND FOR JURY TRIAL          - 32 -

2002 that the lead material known as silicon insulation was inadequate, defective and not suitable for long-term implantation in human beings in the design of the defibrillator leads known as the Riata series. Despite Defendants being made aware of failure of the leads and externalization of the lead cables causing failure, injury and death, Defendants failed to communicate this information both to the FDA, doctors, and the general public including Plaintiff, up until 2009.

147.    Despite the information that Defendants had knowledge of the inadequacy of long-term use of the silicone rubber insulation in their Riata Leads series at least in or after 2002, Defendants merely provided inadequate and defective warnings and instructions in their labeling and manuals of the dangers, lack of long-term knowledge, failure modes, and other and specific information related thereto and as hereinabove alleged in each and every of the Riata series leads, labels and manuals provided thereafter to doctors, patients, the general public, and Plaintiff herein, specifically up until the lead recall in 2011.

### VII.    CLAIMS FOR RELIEF

### COUNT I

### STRICT LIABILITY – MANUFACTURING DEFECT

148.    Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

149.    Upon information and belief, the Riata Leads possess a manufacturing defect because the actual manufacture of the Riata Leads differs from the specifications set forth in the PMA and the conditions for approval as herein before alleged. Said manufacturing defects breached Defendants' duty under negligence and strict liability laws of the State of California and/or of any state whose laws are deemed applicable by this Court, and which laws parallel the federal law duty under the MDA and not more.

150.    The manufacturing defects render the Riata Lead unreasonably dangerous for its intended use and Plaintiff could not have anticipated the danger the defect in this product created.

151.    This manufacturing defect was present in the Riata Lead when it left St. Jude's

control.

152.    The Riata Leads were expected to and did reach Plaintiff and were implanted in Plaintiff in a foreseeable and anticipated manner without substantial change or adjustment to their mechanical function upon implanting the Riata Leads and defibrillator assembly.

153.    As a direct and proximate result of the manufacturing defect, Plaintiff has sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, mental anguish, economic losses, and other damages for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT II

## NEGLIGENCE IN MANUFACTURING

154.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

155.    Defendants have a duty to manufacture the Riata Leads consistent with the PMA and conditions of approval.  Defendants breached this duty.  Said negligence breached Defendants' duty under the negligence liability laws of the State of California and/or of the state whose laws are deemed applicable by this Court, and which laws parallel the federal law duty under the MDA and not more.

156.    As a direct and proximate result of St. Jude's failure to manufacture the Riata Leads consistent with the PMA and conditions of approval, Plaintiff has sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, mental anguish, economic losses, and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT III

## FAILURE TO WARN (NEGLIGENCE)

157.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

158.    Federal Regulations impose standards of care on St. Jude Medical related to the manufacture, marketing, and sale of the Riata Leads.

COMPLAINT AND DEMAND FOR JURY TRIAL            - 34 -

159.    Plaintiff alleges the Federal Regulations define the standard of care, and thus, St. Jude's duties are contained in, but not limited to, the following:  21 CFR 803.10; 21 CFR 803.50; 21 CFR 803.52; 21 CFR 803.53; 21 CFR 803.56; 21 CFR 806; 21 CFR 814.80; 21 CFR 814.82; 21 CFR 814.84; 21 CFR 820.5; 21 CFR 820.20; 21 CFR 820.22; 21 CFR 820.25; 21 CFR 820.70.

160.    Plaintiff is within the class of persons the statutes and regulations protect and Plaintiff's injuries are the type of harm these statutes and regulations are to prevent.

161.    Upon information and belief the Conditions of Approval for the Riata Leads incorporate these statutes and regulations.  Failure to comply with the Conditions of Approval invalidates the approval order.  *See* 21 CFR 814.82(c).  St. Jude failed to comply with the Conditions of Approval and Federal Regulations.

162.    Defendants, as herein before alleged, knew they did not know the suitability of the Riata Leads for long-term use and/or, in the alternative, knew that silicone insulated leads were not suitable for long-term use in human beings.

163.    Defendants negligently failed to adequately warn doctors, the general public and Plaintiff of their lack of knowledge and/or knowledge of unsuitability as alleged in Paragraphs 101-147 such that Plaintiff, prior to implantation in 2007, would not have had the leads implanted in his bodies as alleged.

164.    Defendants had a continuing duty to monitor the Riata Leads after pre-market approval and to discover and report to the FDA and to the doctors, general public and Plaintiff, any complaints about the product's performance and any adverse health consequences of which they became aware and that are or may be attributable to the product.

165.    St. Jude negligently failed to timely provide, before Plaintiff's implantation in September 2007, information to the FDA, doctors, general public and Plaintiff, regarding complaints concerning the product and/or adverse health consequences, manufacturing defects and procedures, and significant improvements of which it became aware and that were attributable to the product.  By failing to do so, Defendants breached their duty under negligence and strict product liability under the laws of the State of California and/or of any

COMPLAINT AND DEMAND FOR JURY TRIAL                    - 35 -

state whose laws are deemed applicable by this Court, and which laws parallel the federal law duty under the MDA and not more, to Plaintiff as herein alleged.

166. Had Defendants properly reported the adverse events and amended their user instructions as required under law, that information would have reached Plaintiff and his treating physicians prior to Plaintiff's implantation of the devices, such that Plaintiff would not have had the devices implanted in them and thereafter suffered injury.

167. As a direct and proximate result of Defendants' failure to warn of their lack of knowledge of long-term use and/or knowledge of the unsuitability of the Riata silicone insulated leads as aforesaid alleged, timely report adverse events and failures as required under law, Plaintiff has sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, mental anguish, economic losses, and other damages for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial as hereinbefore alleged.

## COUNT IV

### FAILURE TO WARN (STRICT PRODUCT LIABILITY)

168. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

169. Plaintiff specifically incorporates also the information and allegations contained in Paragraphs 101-147 herein as if fully set forth.

170. Defendants, as herein before alleged, knew they did not know the suitability of the Riata Leads for long-term use and/or, in the alternative, knew that silicone insulated leads were not suitable for long-term use in human beings.

171. Defendants defectively failed to adequately warn doctors, the general public and Plaintiff of their lack of knowledge and/or knowledge of unsuitability as alleged previously in Paragraphs 101-147, 169 such that Plaintiff, prior to implantation in 2007, would not have had the leads implanted in his body as alleged.

172. Plaintiff herein specifically had the Riata Leads and defibrillator system installed in his body in 2007. Defendants' manuals, user manuals, labeling as well as Dear

COMPLAINT AND DEMAND FOR JURY TRIAL          - 36 -

Doctor letters and other communicative devices and documents to the FDA, doctors and the general public was defective in failure to report information required after the approval of the FDA in 2002 pursuant to 21 CFR 803, 814.84 and 814.8 and California law, such that the information did not get to Plaintiff in order for Plaintiff to make an informed decision whether to risk the implantation of Defendants' defibrillator system or not. Plaintiff would not have had such implantation had he been provided adequate and non-defective warnings, information, and history including knowledge of improved products being approved with more robust and stronger leads being available.

173.    Based on information gathered, after 2002, Defendants failed to provide adequate instruction and information to the FDA, doctors and general public of how the product should be used and information of the foreseeable risks or side effects that may follow foreseeable use of the product already implanted in individuals and prior to implantation as alleged herein for plaintiff, and each of them.

174.    As a direct and proximate result of the defective failures to warn, manuals and labeling and failure to timely report adverse events, and subsequent history as required by law, plaintiff has sustained and will continue to sustain severe physical injury and/or death, severe emotional distress, mental anguish, economic loss, loss of earning capacity, and other damages for which they are entitled to compensation in an amount to be proven at trial as herein before alleged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    Economic and non-economic damages in an amount as provided by law and to be supported by the evidence at trial;

2.    For compensatory damages according to proof;

4.    For all medical expenses (past and future), evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical, and incidental expenses, costs, and losses caused by Defendants' wrongdoing;

4.    For disgorgement of profits;

COMPLAINT AND DEMAND FOR JURY TRIAL                - 37 -

5.    For an award of attorneys' fees and costs;

6.    For prejudgment interest and the costs of suit; and

7.    For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:    October 13, 2014

FRANECKE LAW GROUP

By_____

LOUIS S. FRANECKE
Attorneys for Plaintiff